The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Taylor and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law, the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Commission and the Commission has jurisdiction of the parties and of the subject matter.
2. All parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. All parties have been properly designated and there is no question as to misjoinder or nonjoinder or parties.
4. An employment relationship existed between the parties on May 24, 1996. Perdue Farms, Inc., is the defendant-employer and Lewis McCain is the plaintiff-employee.
5. Plaintiff suffered an injury by accident to his right knee arising out of and in the course and scope of his employment on May 24, 1996. Defendant accepted liability for this claim.
6. At all relevant times, Perdue Farms, Inc., is and was self-insured for the purposes of meeting the requirements of the North Carolina Workers' Compensation Act. The servicing agent is Crawford and Company.
7. At the time of plaintiff's injury, his average weekly wage was $325.98 and his weekly compensation rate was $217.34.
8. The depositions of Scott S. Sanitate, M.D. and Brian T. Szura, M.D. are a part of the evidentiary record in this matter.
 ***********
The parties entered into a Form 21, Agreement for Compensation, which was approved by the Commission on April 6, 1998. That agreement provided compensation for plaintiff at the rate of $217.34 for necessary weeks. The Form 21 agreement constitutes an Award of the Commission and is incorporated herein.
 ***********
Based upon the evidence of record and the findings of fact found by the Deputy Commissioner, the Full Commission finds as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was forty-six years old. Prior to working for defendant, plaintiff worked for Burns Security for six years as a security guard where he checked trucks to make sure they were sealed after they were loaded. Plaintiff was able to get to and from this job without problems, despite not having a driver's license, and worked satisfactorily until his company lost its service contract. Plaintiff next worked in maintenance for a golf course in Southern Pines for two years, twenty-five miles each way from his home, until he quit. Plaintiff then took a job in landscaping which paid approximately $5.00 per hour located in Southern Pines, also twenty-five miles from his home. Plaintiff was also able to get back and forth to this job in a satisfactory manner. Before working for defendant, the highest paying job plaintiff held paid $5.70 per hour.
2. In 1993 plaintiff began working for defendant in Eagle Spring. His starting salary was $6.10 per hour. This job was between sixteen to twenty miles from plaintiff's home. Plaintiff worked for defendant through 1997. During this period, plaintiff was able to travel to and from work without difficulty.
3. Plaintiff suffered a compensable injury to his right knee on May 24, 1996, for which defendant accepted liability. On February 10, 1998, defendant began paying plaintiff temporary total disability benefits. On or about May 10, 1999, defendant assigned George Lentz of Crawford 
Company as plaintiff's vocational counselor. Mr. Lentz has worked in vocational services for over 30 years. He previously worked for the North Carolina Department of Vocational Rehabilitation for eleven years and holds certificates as a nationally certified rehabilitation counselor and a state licensed professional counselor.
4. On May 28, 1999, Mr. Lentz conducted an initial evaluation with plaintiff, plaintiff's wife, and plaintiff's counsel. At this evaluation, Mr. Lentz reviewed plaintiff's background and medical condition and discussed vocational issues. Mr. Lentz discovered that plaintiff has a ninth grade education. Mr. Lentz also took an employment history, which included plaintiff's prior work experience as a security officer. According to Mr. Lentz, plaintiff informed him at this meeting that he did not have a criminal record. This was corroborated by Mr. Lentz's records made at the time of the assessment.
5. Based on this meeting and the information provided by plaintiff, Mr. Lentz prepared a vocational assessment approximately four months later. This delay was caused by miscommunication between Mr. Lentz and plaintiff's counsel. During this time, however, Mr. Lentz began identifying possible jobs for plaintiff. The first job was for a newspaper route job, which would have required plaintiff to deliver newspapers in the Robbins area. On June 28, 1999, Mr. Lentz sent a copy of this job description to Dr. Szura, plaintiff's treating physician, for approval. Dr. Szura approved the job for plaintiff. However, Mr. Lentz did not pursue this job opportunity for two reasons. First, Mr. Lentz found another job for plaintiff. Second, Mr. Lentz felt that since plaintiff did not have a driver's license, the job would be impractical.
6. At this time, Mr. Lentz identified a security officer job with Lankford Protective Services (LPS), providing guard services at Montgomery County waste sites. After speaking with Skip Labonte, training officer for LPS, Mr. Lentz discussed the job with Johnny Callicutt, site manager, and Sonny Apple, regional manager. Mr. Lentz went to the job site and observed the security officer job with Mr. Callicutt. The job duties included staying in a guardhouse at a county waste site and allowing people to come and go and deposit trash. No lifting or patrolling is involved. Mr. Lentz felt that this job was appropriate for plaintiff based on his prior job experience as a security guard.
7. Plaintiff treated with Dr. Szura, a board-certified orthopedic surgeon, from June 25, 1996 through June 14, 2000. Plaintiff presented to Dr. Szura suffering from chondromalacia patella, which is a wearing of the cartilage on the undersurface of the kneecap. It was Dr. Szura's opinion that this was caused in part by wear and tear over time and in part because of plaintiff's compensable injury. On October 2, 1998, following a functional capacity evaluation, Dr. Szura found that plaintiff was at maximum medical improvement with a 35% permanent partial impairment of the right leg and permanent restrictions of no lifting or carrying greater than 30 pounds with occasional climbing of stairs, occasional kneeling and occasional stooping. Thereafter, Dr. Szura saw plaintiff again on July 2, 1999 and noted that plaintiff continued on the same restrictions and that surgical replacement of the joint would not address plaintiff's problems. Dr. Szura again saw plaintiff on May 30, 2000 and plaintiff's condition remained the same. However, at that time, Dr. Szura increased plaintiff's rating from 35% of the right leg to 40% of the right leg due to plaintiff's continuing chronic pain.
8. Plaintiff was referred to Dr. Sanitate by Dr. Szura for treatment of his chronic pain. Dr. Sanitate agreed with Dr. Szura's rating and restrictions.
9. Sonny Apple, the district supervisor for LPS, who has worked for LPS for almost seven years, but who also has thirteen (13) years of experience in the loss prevention and security fields, also offered details concerning the security officer position. The security officer position available for plaintiff involved monitoring Montgomery County waste sites. The officer works from a guardhouse, where he or she can sit or stand as needed, and ensures that people throw the correct trash into the correct bins. There is no handling of money, no patrolling and no lifting. The position's salary is $5.50 per hour. LPS employees have health insurance available, a shoe program, Christmas bonuses and paid vacation based on hours worked per week. The position guarantees 24 hours of work per week, with the likelihood of 36 to 48 hours per week if the employee wishes to work extra shifts. Apple explained that when he offered the job to plaintiff in September 1999, there were other shifts available and plaintiff could have worked up to 48 hours per week.
10. Johnny Callicutt, who has been employed as a site supervisor for LPS for two years, but who has worked as the supervisor over the Montgomery County sites since January 1993, provided similar information as to the security officer job. Mr. Callicutt's testimony regarding the position is credible. As far as hours of work, an individual could work extra shifts, in addition to the guaranteed 24 hours per week, every week. In the security officer job, plaintiff could work as much as 52 hours per week if desired, as that amount of work was available for him and would remain available for him.
11. The security officer job with LPS also provided plaintiff an opportunity for advancement in that plaintiff could have applied for a supervisory position for LPS, with a corresponding pay increase. Furthermore, plaintiff's salary as a security officer would have been subject to increase based on the Montgomery County contract.
12. Based on his understanding of the job, Mr. Lentz prepared a written job description of the security officer job. He then sent that job description to Dr. Szura and Dr. Scott Sanitate, a physiatrist who was also treating plaintiff at the time. Both physicians unconditionally approved the job description as within plaintiff's physical restrictions. Neither physician expressed any reservations about plaintiff performing the security guard job, or limited the number of hours that plaintiff could work in a week at the job.
13. After receiving the job approvals from the physicians, Mr. Lentz provided the job descriptions, job information, and physicians' approvals to plaintiff's counsel. Included in this information was an application for employment and other employment information. Mr. Lentz met with Plaintiff and his counsel on September 2, 1999. Mr. Lentz tried to discuss the rehabilitation plan that he had proposed previously, but plaintiff's counsel informed him that it was not going to be signed. Accordingly, nothing further was discussed of the plan. They also discussed the job with LPS, which plaintiff's counsel stated was not acceptable because it was a part time job. Mr. Lentz informed plaintiff and plaintiff's counsel that the job offered full time work and the job was available for plaintiff.
14. Subsequent to this meeting, on September 9, 1999, Mr. Lentz sent a letter to plaintiff's counsel detailing the specifics of the job. The letter provided that:
 "I visited with Mr. Callicutt at the Lovejoy Solid Waste Center site and he agreed to call Mr. McCain and discuss the schedule and provide an orientation. Once a starting date is determined, he will probably start working a 24-hour per week schedule at one of the three sites marked on the attached map. The sites are open on the days indicated (Monday, Wednesday, Friday and Sunday) with some exception not listed of sites open on Tuesday and Thursday. Mr. McCain will have the choice to work more hours (potentially 40 per week) if he so chooses. Mr. Callicutt selected the three marked sites closest to the claimant's home (10 miles or less) and all along highway 220 for easy access. The starting hourly pay is $5.50 per hour, with potential for full-time overtime."
The purpose of this letter was to clarify issues from the September 2, 1999 meeting. A few days after Mr. Lentz sent the September 9, 1999 letter, he received a telephone call from plaintiff's counsel stating that the job was not appropriate and that plaintiff would not apply for the job.
15. In the interim, plaintiff had no contact at all with Mr. Callicutt. However, Sonny Apple interviewed plaintiff in a telephone conversation. Plaintiff called Mr. Apple to inquire about the Montgomery County security officer job and Mr. Apple informed plaintiff that the job was available for him and explained the physical requirements of the job. Mr. Apple also told plaintiff about the salary and benefits for the job and provided the name and phone number of Johnny Callicutt, the site supervisor. Plaintiff did not tell Mr. Apple that he had any transportation problems or that he had any prior criminal background. Ultimately, Mr. Apple told plaintiff to call Mr. Callicutt to look at the site and if he liked the site, Mr. Apple would process plaintiff's employment paperwork.
16. The security officer job was both available to plaintiff and offered to plaintiff by Mr. Apple. Mr. Apple never heard from plaintiff about the job. However, Mr. Lentz later called Mr. Apple and informed him that plaintiff's attorney had refused the job. Mr. Apple recorded this information on a job interview form and a job offer form, on which he recorded the specifics of the job and the fact that he had offered the job to plaintiff and that plaintiff's attorney had advised plaintiff not to accept the job.
17. As far as his criminal record, plaintiff submitted evidence that in the 1980's he was convicted of a misdemeanor of communicating threats to his wife. He also was convicted of misdemeanor simple assault in 1987 and a misdemeanor of operating a vehicle without a driver's license in 1993. According to plaintiff, the one occasion where he was caught driving a vehicle was the one and only time he had ever driven a vehicle in his life. Mr. Apple, however, explained that he has hired people who had past misdemeanor convictions, including people with assault charges, and the State has licensed them. Plaintiff's criminal record would not preclude him from the security officer job.
18. Plaintiff has not been employed or sought employment since October 1999. Instead, plaintiff applied for and began receiving social security disability benefits.
19. The testimony of Sonny Apple is credible with respect to his communications with plaintiff, the availability of suitable employment for plaintiff with LPS, and his offer to employ plaintiff with LPS. Conversely, plaintiff's testimony is not credible in this regard, based on his demeanor at the hearing as observed by the Deputy Commissioner and his failure to provide clear and consistent testimony.
20. The position with Lankford Protective Services was suitable for plaintiff in that it was a full time job which would offer plaintiff as much as 52 hours of work per week, the opportunity for advancement existed in the job, the job was within ten miles of his home, which was closer than all prior jobs held by plaintiff, and it was a regular job which was available in the competitive economy.
21. Plaintiff was offered the security guard job by both George Lentz and Sonny Apple. Nevertheless, plaintiff refused the suitable employment offered to him by Lankford Protective Services on September 9, 1999.
 ***********
Based on the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff suffered a compensable injury by accident and a Form 21 was approved by the Commission. N.C.G.S. § 97-2(6).
2. Plaintiff unjustifiably refused suitable employment offered to him by Lankford Protection Services on September 9, 1999. Accordingly, plaintiff is not entitled to weekly disability benefits from September 9, 1999 until such refusal ceases. N.C.G.S. § 97-32.
3. Defendant has rebutted any Form 21 presumption of total disability by showing that plaintiff was released to employment, was provided suitable employment, but refused to accept the same. N.C.G.S. § 97-29.
4. Plaintiff reached maximum medical improvement for his compensable injury on October 15, 1998, and retains a 40% permanent partial disability impairment rating to his leg. As plaintiff was paid weekly benefits from October 15, 1998 through November 8, 1999, which are credited against his entitlement to permanent partial disability benefits, plaintiff is entitled to payment of 2.2 weeks of permanent partial disability benefits at his weekly compensation rate of $217.34 in satisfaction of the benefits owed for his permanent partial disability rating, subject to a reasonable attorney's fee of twenty-five percent. N.C.G.S. § 97-31.
5. Subject to the limitations of N.C.G.S. § 97-25.1, plaintiff is entitled to payment of reasonably necessary medical treatment related to his compensable injury which tends to effect a cure, provide relief or lessen the period of disability. N.C.G.S. § 97-25.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission adopts and affirms the holding of the Deputy Commissioner and enters the following:
 ORDER
1. Plaintiff's weekly disability benefits are hereby suspended as of September 9, 1999 based on his refusal to accept suitable employment.
2. Defendant shall pay to plaintiff 2.2 weeks of permanent partial disability benefits at a weekly compensation rate of $217.34, as payment for plaintiff's rating, from which twenty-five percent shall be deducted and paid in a lump sum to plaintiff's counsel.
3. Defendant shall bear the costs, including expert witness fees, in the amount of $185.00 to Dr. Sanitate and $275.00 to Dr. Szura, if not already paid.
This the ___ day of August 2001.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER